Kevin ETIENNE, Plaintiff

v.

WAL–MART STORES, INC., Defendant

No. 3:00–CV–1475(EBB).

United States District Court,
D. Connecticut.

Nov. 30, 2001.

Robert T. Rimmer, Brown, Paindiris & Scott, Hartford, CT, for Plaintiff.

Joel L. Finger, Gregory B. Reilly, Brown, Raysman, Millstein, Felder & Steiner, New York City, for Defendant.

### RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

ELLEN B. BURNS, Senior District Judge.

### INTRODUCTION

Plaintiff Kevin Etienne ("Etienne" or "Plaintiff") brings this five-count Complaint against Defendant Wal–Mart Stores, Inc. ("Wal–Mart" or "Defendant"). The causes of action are racial discrimination under Title VII, constructive discharge, the intentional and negligent infliction of emotional distress and false imprisonment, all arising out of his two-week suspension and demotion by Wal–Mart. Wal–Mart now moves for summary judgment on all counts.

### STATEMENT OF FACTS

The Court sets forth only those facts deemed necessary to an understanding of the issues raised in, and decision rendered on, this Motion. The facts are culled from the Complaint, the parties' memoranda of law and exhibits thereto, and their Local Rule 9(c) Statements.

Etienne is an African–American who was employed as an at will employee at the Wal–Mart store in East Windsor, Connecticut from May 20, 1997 until on or about November 6, 1998. His first job was as the Manager of the Lawn and Garden department. He was subsequently demot-

ed to cashier in October, 1998, after he was accused of stealing from Defendant and failing to perform his job in the manner in which Wal–Mart expected of him. Defendant voluntarily left the employ of Wal–Mart, asserting that he was constructively discharged due to intolerable working conditions as a cashier. His claim to constructive discharge is based on the fact that the other department managers did not speak to him and he was denied, by his African–American supervisor, three of the forty-five breaks he believed were due him.

Although denominated as "department manager", Plaintiff had no managerial duties. He punched a time clock as did all employees of the store. Upon hire, Plaintiff received approximately one month training in, *inter alios,* loss prevention, *i.e.,* store security, policies and procedures regarding same. This was reinforced by computer testing. In particular, Etienne was trained in the prevention of "shrinkage", a Wal–Mart term referring to the loss of merchandise due to theft, damage, or misplacement. As soon as Plaintiff discovered shrinkage in his department, he was to immediately report same to his supervisor. During his entire tenure as department manager, Plaintiff never reported any shrinkage. In fact, during September and October, 1998, there was severe shrinkage in Plaintiff's department, including the loss of a grill, a "weed-wacker" and a snowblower. Although earlier in his tenure, Plaintiff had received good evaluations from his supervisor, Wal–Mart determined at the time in issue that he had completely failed to keep inventory procedures according to his job inventories. Plaintiff claimed he knew nothing about the losses, when in fact they had been stolen from his department by a number of his employees.

On or about October 1, 1998, Wal–Mart commenced an investigation of one of the store's Lawn and Garden employees, John Renaud ("Renaud"), for theft. Pursuant to that investigation, Wal–Mart learned through Renaud that he and other Lawn and Garden employees had been stealing this high cost merchandise from the store. Renaud, who confessed to the thefts, identified Plaintiff as being involved with the thefts.

As a result, Wal–Mart's District Loss Prevention Supervisor, James P. Hebert ("Hebert"), determined that all of the co-conspirator employees identified by Renaud should be interviewed in order to determine their knowledge/involvement in the thefts. Eric Baxter ("Baxter"), another District Loss Prevention Supervisor, aided Hebert in conducting the interviews. In addition to Plaintiff, the following were interviewed: Jose Ortiz and Paul Zapata, both Hispanic males, Eric Fernandez, who is a bi-racial male, and Nicholas Schiralli, a white male.

During the interviews, conducted according to Defendant's policies and procedures, Fernandez also confessed to the thefts and he, too, implicated Plaintiff. He confessed that he helped Etienne steal DVD players, snow blowers and other merchandise from the store. He spoke in detail about how his associates "would all work as a team, but they were actually working for [Plaintiff]".

Fernandez also prepared a written statement again implicating Plaintiff in the thefts. He wrote, inter alios,: "For the past couple of months I have taken [,] seen stuff taken and helped other[s] take merchandise from the Store... I was a look out person for other tak[ing] merchandise—clothes, DVDs & other electronics, grills—snowblower. I knew about 4 people who took merchandise—Kevin [Plaintiff], John, Paul and Nick. I also know that Keven [Plaintiff] and John sold merchandise."

Plaintiff was the last person interviewed. He denied any knowledge of losses of "high dollar merchandise" from his department. However, Plaintiff's short, evasive and inconsistent answers to the inquiry caused Hebert and Baxter to be suspicious of the truthfulness of his statements. In fact, they reported to Store Manager Jackie Gonzales ("Gonzales") that they believed Plaintiff was lying to them about his knowledge of, and involvement in, the thefts. Accordingly, Gonzales suspended Etienne for two weeks, pending the completion of the investigation.

Upon Plaintiff's return to work, Gonzales advised Plaintiff that he was being demoted to the position of cashier, with a pay-cut of one dollar an hour. She told him that he was being demoted because expensive merchandise had been stolen from his department and because he had no control over that department. Another reason for the demotion to cashier was that it was easier for Loss Prevention to monitor him there, where there were more security cameras and supervisors.

Plaintiff asserts that he should not have been demoted because two white managers of other departments from which Fernandez stole were not demoted. However, at no time were either of these managers identified by co-workers as being involved with any thefts from their respective departments.

After his demotion, Etienne worked as a cashier for three weeks. He claims that during this time the other department managers would not speak to him. He also complained of not being given, by his African–American supervisor, three of the forty-five breaks which he believed were due him. He testified, however, that he did not know if other cashiers also were denied breaks.

After three weeks, Plaintiff stopped coming to work. He did not notify anyone at Wal–Mart of his decision to quit. He was not fired or otherwise terminated by Wal–Mart

## LEGAL ANALYSIS

### I. *The Standard of Review*

In a motion for summary judgment the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). *See also Anderson v. Liberty Lobby*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment).

If the nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof at trial, then summary judgment is appropriate. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322–23, 106 S.Ct. 2548. *Accord, Goenaga v. March of Dimes Birth Defects Foundation*, 51 F.3d 14, 18 (2d. Cir.1995) (movant's burden satisfied if it can point to an absence of evidence to support an essential element of nonmoving party's claim).

The court is mandated to "resolve all ambiguities and draw all inferences in favor of the nonmoving party...." *Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir.), *cert. denied*, 506 U.S. 965, 113 S.Ct. 440, 121 L.Ed.2d 359 (1992). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.), *cert.*

*denied,* 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991). If the nonmoving party submits evidence which is "merely colorable", or is not "significantly probative," summary judgment may be granted. *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505.

"[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact. As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 247–48, 106 S.Ct. 2505 (emphasis in original).

## II. *The Standard As Applied*

### A. *Plaintiff's Title VII Claim*

■ In order to set forth a prima facie case under Title VII, a plaintiff must meet four elements: (1) that he was a member of a protected class; (2) that he was performing his job satisfactorily; (3) that he was subjected to an adverse employment action; and (4) the decision occurred under circumstances giving rise to an inference of discrimination. *Fisher v. Vassar College,* 114 F.3d 1332, 1335 (2d Cir.1997) (en banc), *cert. denied,* 522 U.S. 1075, 118 S.Ct. 851, 139 L.Ed.2d 752 (1998). The burden a plaintiff carries to survive a motion for summary judgment at the prima facie stage is ordinarily minimal. *Id.* at 1340 n. 7.

In the present case, however, Plaintiff fails to meet his minimal burden of his prima facie case, inasmuch as he was not performing his job in a satisfactory manner nor was the treatment of him anything which would give rise to an inference of discrimination.

■ Plaintiff does not dispute that a primary duty he had as a department manager was to prevent shrink and carefully keep track of inventory. He had the daily responsibility of verifying that he was displaying Wal–Mart's requisite number of merchandise items on the store floor and checking that he was not storing too few or too many replacement items in the warehouse.

As of October 2, 1998, it became clear to his supervisors that Plaintiff was not fulfilling these duties. Hence, he was not performing his job in a satisfactory manner. Wal–Mart discovered that stockers who worked in the Lawn and Garden department had stolen numerous items of merchandise from the department, including a grill, a "weed-wacker", and a snowblower. It also learned that the items were being stored in bins in the department prior to being removed, and that the items were finally removed through exits in the department. When confronted with these losses—which Plaintiff did not account for in his daily inventory—Plaintiff denied awareness that the items were even missing, let alone stolen. He admitted that, during his entire tenure at Wal–Mart, he had never reported shrinkage to a supervisor.

As noted above, Etienne was implicated in the thefts by two co-workers in his department, who had confessed to the crimes. Further, due to his short, evasive and inconsistent statements during his interview, the Loss Prevention Supervisors believed that Plaintiff was lying about his involvement in the thefts and reported this to Gonzales.

Plaintiff also admitted that this was not the first time merchandise had been stolen from his department and again, due to his failure to keep proper inventory, he was

not even aware of the thefts until the employee in the department was fired.

For these reasons, as of October, 1998, Plaintiff was not performing his job according to Wal–Mart specifications. Hence, he fails to meet the second element of his prima facie case.

 He also fails to meet the fourth element of his prima facie case. Although Plaintiff claims he was suspended and demoted due to his race, in reality the actions were taken because of his failure to do his job properly and the allegations that he, too, was involved with the theft of the merchandise. Hence, putting him in a cashier's position, where there was monitoring and security cameras, was an acceptable decision for Wal–Mart to make. His claim that he was denied three of his forty-five breaks due to his race also fails, as he testified that he did not know if cashiers of other races were also denied breaks.

 His final claim of inference of discrimination is that two non-African American department managers, Dennis Lemire and Karen Fernandez, who suffered shrinkage were not interviewed or demoted. The Second Circuit recognizes that the fourth element of a prima facie case may be satisfied by demonstrating that the plaintiff was treated differently than "similarly situated" persons. *Shumway v. United Parcel Service, Inc.,* 118 F.3d 60, 64 (2d Cir.1997). "To be 'similarly situated,' the individuals with whom [Plaintiff] attempts to compare [himself] must be similarly situated in all material respects." Id. What constitutes "all material respects" is to be judged based on (1) whether the plaintiff and those he maintains are similarly situated were subject to the same workplace standards and (2) whether the conduct for which the employer imposed discipline was of comparable seriousness. *Norville v. Staten Island Univ. Hosp.,* 196 F.3d 89, 96 (2d Cir.1999).

The inquiry in this case must be answered in the negative. Although the three managers were subject to the same workplace standards, neither was accused of theft from his or her own department.

These department managers are also not similarly situated to Plaintiff because material differences exist in the types of items stolen from their departments, as well as the location and manner in which they were stolen. For instance, the only item stolen from Paper Goods and Chemicals was a $5.98 roll of paper towels—not the type of large or high priced goods which should have been immediately noted and reported. As to the Electronics department, the manager took consistent inventory and reported shrinkage immediately. Further, the stolen compact discs, movies and tapes were displayed in stack bases stocked and maintained by outside vendors. Fernandez, therefore, did not have the same responsibilities for keeping track of the entire Electronics inventory that Plaintiff had for keeping track of the Lawn and Garden inventory.

The Court finds that the Plaintiff was not similarly situated in all material respects to Fernandez and Lemire. Accordingly, for this reason, too, Plaintiff fails to meet his burden on the fourth element of his prima facie case.

**B. *Constructive Discharge***

 To establish a claim for constructive discharge, Plaintiff must prove that Wal–Mart deliberately made his working conditions so intolerable that he was forced to resign. *Kirsch v. Fleet Street, Ltd.,* 148 F.3d 149, 161 (2d cir.1998). Plaintiff cannot meet this burden of proof. The "intolerable working conditions" which he claims are two-fold: first, that his co-workers did not speak to him, i.e. greet him in the morning, and he was denied

three of forty-five breaks which he believed were due him.

■ Intolerability of working conditions is based on an objective standard of whether a reasonable person in the employee's position would have felt compelled to resign. An employee's subjective opinion that his or her working conditions are intolerable is not sufficient to establish constructive discharge. *Pena v. Brattleboro Retreat,* 702 F.2d 322, 325 (2d cir. 1983).

The Court finds that Plaintiff's allegations would not lead a reasonable person to feel compelled to resign. This District has ruled that a plaintiff's allegation that she was treated coldly after she prevailed on a labor grievance and that her supervisors would not look or speak to her was insufficient to find constructive discharge. *Lombardo v. A.W. Oppenheimer, et al.,* 701 F.Supp. 29 (D.Conn.1987). The Court held that plaintiff's treatment, "though potentially unpleasant, was not significantly offensive and [was] insufficient to support a finding of constructive discharge." *Id.* at 32. *Accord Drake v. Minnesota Min. and Mfg. Co.,* 134 F.3d 878, 882, 886–87 (7th Cir.1998) (no constructive discharge where plaintiff alleged that no one at work would talk to him and that co-workers would leave the room when he entered); *Munday v. Waste Management of North America,* Inc., 126 F.3d 239, 241, 244 (4th Cir. 1997), *cert. denied,* 522 U.S. 1116, 118 S.Ct. 1053, 140 L.Ed.2d 116 (1998) (no constructive discharge when plaintiff was ignored by co-workers).

Applying these persuasive analyses to the present case, and the de minimus denials of three breaks, the Court holds that Plaintiff was not constructively discharged, but voluntarily quit his employment with Wal–Mart.

## C. *Intentional Infliction of Emotional Distress*

■ In order to succeed on a claim for intentional infliction of emotional distress, Plaintiff must establish the following: "(1) that the actor intended to inflict emotional distress or that he knew or should have known that the emotional distress was a likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the distress suffered by the plaintiff was severe." *Appleton v. Stonington Bd. of Ed.,* 254 Conn. 205, 210, 757 A.2d 1059 (2000), *citing Petyan v. Ellis,* 200 Conn. 243, 253, 510 A.2d 1337 (1986). In order to state a cognizable cause of action, Plaintiff must not only allege each of the four elements, but also must allege facts sufficient to support them. *See Meyers v. Bunker Ramo Corp.,* No. B–90–506 (JAC), 1992 U.S. Dist. LEXIS 5336, at *26 (D.Conn.1992). Because this Court finds that Defendant's alleged conduct was not "extreme and outrageous," the other three elements will not be addressed.

■ Whether Defendant's conduct is sufficient to satisfy the element of extreme and outrageous conduct is a question, in the first instance, for the Court. *See Johnson v. Chesebrough–Pond's USA Co.,* 918 F.Supp. 543, 552 (D.Conn.), *aff'd,* 104 F.3d 355 (2d Cir.1996), *citing Mellaly v. Eastman Kodak Co.,* 42 Conn.Supp. 17, 18, 597 A.2d 846 (Conn.Super.Ct.1991). Only where "reasonable minds differ," does it become a question for the jury. *Reed v. Signode Corp.,* 652 F.Supp. 129, 137 (D.Conn.1986); *see also Restatement (Second) of Torts* § 46, cmt. (h) (1965). The general rule "is that there is liability for conduct exceeding all bounds usually tolerated by a decent society, of a nature which is especially calculated to cause, and does cause, mental distress of a very seri-

ous kind." *Mellaly,* 42 Conn.Supp. at 19–20, 597 A.2d 846, *quoting* W. Prosser & W. Keeton, *Torts* § 12, at 60 (5th ed.1984);*see also Restatement (Second) of Torts* § 46, cmt. (d) (1965) ("Liability has been found only where the conduct had been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in civilized society.")[1] "[M]ere insults, indignities, or annoyances that are not extreme or outrageous will not suffice." *Brown v. Ellis,* 40 Conn.Supp. 165, 167, 484 A.2d 944 (Conn.Super.Ct.1984).

In the present case, Plaintiff alleges that his interview, suspension and demotion were extreme and outrageous. This Court, however, finds that these allegations do not satisfy the above requirements of such conduct.

Courts in Connecticut have been reluctant to allow a claim for intentional infliction of emotional distress. *See, e.g., Appleton,* 254 Conn. at 211, 757 A.2d 1059 (finding allegations that school officials made derogatory comments concerning plaintiff's work performance and his ability to read, in front of other employees, contacted plaintiff's daughter to recommend that plaintiff take some time off because he was acting erratically, and arranged to have him escorted by police off of school property insufficiently extreme or outrageous to state a cause of action); *Smith v. City of New Haven, et al.,* 166 F.Supp.2d 636 (D.Conn.2001) (police officers' conduct in drawing gun on arrestee, removing arrestee from his vehicle, searching vehicle, handcuffing him and sitting on him not "extreme or outrageous under Connecticut law"); *Emanuele v. Baccaccio & Susanin,*

1994 WL 702923, *2, 1994 Conn.Super. LEXIS 3156, at *6 (Conn.Super.Ct., Apr. 10, 1992) (holding conduct not extreme and outrageous where at-will employee alleged her employer made false accusations regarding her work performance, and used coercion, threats and intimidation to force her to sign a document against her will, all for the purpose of depriving her of benefits and compensation); *Rock v. Mott Metallurgical Corp.,* 2001 WL 100307, *4–8, 2001 Conn.Super. LEXIS 207, at *13–21 (Conn.Super.Ct., Jan. 10, 2001) (granting defendant's motion for summary judgment where plaintiff alleged that she was ordered to lift and carry heavy objects beyond her ability, was required to work without being supplied the necessary resources, was transferred to a work station without a chair or desk, was called names, and was falsely accused of not finishing her work, because in totality the acts were "less than 'extreme' and 'outrageous' in nature").

Similarly, federal district courts in the Second Circuit have interpreted the qualification of extreme and outrageous strictly. *See, e.g., Reed v. Signode Corporation,* 652 F.Supp. 129, 137 (D.Conn.1986) (holding conduct not extreme and outrageous where a uniform company policy that forbade leaves of absences was applied to an employee seeking a leave to undergo chemotherapy treatments for cancer); *Lopez–Salerno v. Hartford Fire Ins.,* 1997 WL 766890, *7, 1997 U.S. Dist. LEXIS 19724, at *19 (D.Conn., Dec. 8, 1997) (granting motion to dismiss where plaintiff alleged she was terminated so that defendant could avoid giving her long-term disability benefits); *Thompson,* 1998 WL 559735, at *1, 1998 U.S. Dist.

---

[1]. "In interpreting what constitutes 'extreme and outrageous' conduct, Connecticut courts have relied on the Restatement (Second) of Torts § 46, comment (d) (1965) ...." *Thompson v. Service Merchandise, Inc.,* 1998 WL

559735, at *1, 1998 U.S. Dist. LEXIS 13669, at *4 (D.Conn.1998). *See also Appleton,* 254 Conn. at 210, 757 A.2d 1059; *Petyan,* 200 Conn. at 254, 510 A.2d 1337.

LEXIS 13669, at *2–3 (granting motion for summary judgment and finding that allegations made by plaintiff of employer downgrading her race, removing her responsibilities in order to undermine her authority, and failing to provide adequate supervision and sufficient staff to do her job, did not constitute extreme and outrageous conduct).

Applying the appropriate stringent standards in light of such precedents, the Court finds that Defendant's conduct as alleged in the Complaint did not exceed all bounds of decency and is not "extreme and outrageous".

### D. *Negligent Infliction of Emotional Distress*

 In order to establish a cause of action for negligent infliction of emotional distress, the Plaintiff must prove that the Defendant should have: (1) realized that its conduct involved an unreasonable risk of causing distress to Plaintiff; and (2) realized that the distress, if caused, might result in illness or bodily harm. *See Barrett v. Danbury Hospital*, 232 Conn. 242, 260–61, 654 A.2d 748 (1995). In the present case, the Court finds that neither element exists. The interview of Plaintiff after he was accused of theft from Wal–Mart, his suspension and demotion for failing to appropriately do his job were the natural results of the information known to Wal–Mart at the time. There is no reason to believe that Wal–Mart, taking this well-chosen path, should be held to a realization that its conduct involved an unreasonable risk of causing distress to Plaintiff. Accordingly, this claim also fails.

### E. *False Imprisonment*

Plaintiff alleges that the interview of him consisted of false imprisonment under Connecticut General Statute Section 53–a119a(a). The Court disagrees and finds that that statute does not apply to employees of a store, but to the process a store may use at the time it suspects an individual of shoplifting. "This statute was not passed to give protection to employees accused of theft by the employer." *Greenleaf v. Ames Department Stores*, 1995 WL 49319, at *6–7, 1995 Super.LEXIS 283 at *16–17 (Conn.Super.Jan. 23, 1995).

Accordingly, Plaintiff fails to meet his burden on this claim, also.

### CONCLUSION

Plaintiff has set forth no genuine issues of material fact on which he would bear the burden at trial. Resultingly, for the reasons set forth herein, Defendant's Motion for Summary Judgment [Doc. No. 34] is hereby GRANTED. The Clerk is directed to close this case.

SO ORDERED.